**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **United States of America**, | |
| *Plaintiff,* | |
| v. | Case No. **23-cr-50 (JMC)** |
| **Dillon Paul Homol**, | **Sentencing: January 18, 2024** |
| *Defendant.* | **1:00 p.m.** |

**Defendant's Sentencing Memorandum and Position with Respect to
Sentencing Factors**

Defendant Dillon Paul Homol, by counsel, submits this memorandum to further assist the Court in determining a fair and just sentence in this matter. Mr. Homol is scheduled to be sentenced on January 18, 2024, on four misdemeanors offenses.

On March 16, 2021, Mr. Homol was arrested at his home in Cocoa Beach, Florida on five charges stemming from his involvement at the United States Capitol on January 6, 2021. The charges were: (i) Corruptly Obstructing an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), (ii) Entering a Restricted Building in violation of 18 U.S.C. § 1752(a)(1), (iii) Disorderly Conduct in a Restricted Building in violation of 18 U.S.C. § 1752(a)(2), (iv) Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and (v) Demonstrating in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). Mr. Homol was released pending trial on conditions which included pretrial supervision. Since that time, Mr. Homol has fully complied with all the conditions of his release.

On February 15, 2023, Mr. Homol was indicted on the five counts charged at the time of his arrest. Mr. Homol was arraigned on the indictment on February 23, 2023, at which time he entered pleas of not guilty to all charges and waived his right to a jury trial.

1

A bench trial was subsequently set for September 25, 2023.  On August 25, 2023, Mr. Homol filed notice with the Court of his intent to plead guilty to Count 5 of the indictment for unlawfully demonstrating in the Capitol.  The bench trial on the remaining counts began on September 27, 2023.  At the conclusion of the bench trial, the Court found Mr. Homol guilty of the three remaining misdemeanors (Counts 2 through 4) but acquitted him of the felony charged in Count 1.

**I.      Corrections or Objections to the Presentence Report.**

     *a.      Corrections or objections to facts*

     1.      Paragraph 5 of the presentence report states, in part, "On September 28, 2023, the defendant pled guilty to Count 5, Parading, Demonstrating, or Picketing in a Capitol Building. . ."  Mr. Homol wishes to clarify that he filed a Notice of Intent to Amend Plea on August 25, 2023, (Dkt. 75) and reiterated his intent to plead guilty to Count 5 at the status conference held on September 25, 2023.  At the Court's suggestion, the guilty plea was not taken until the beginning of the Defendant's case on September 28.

     2.      Paragraph 12 under the section entitled "The Offense Conduct" states, in part, that "Homol and the now violent mob eventually reached the Capitol's West Plaza."  To the extent this sentence implies that Mr. Homol was behaving violently, it is objected to.  While many people in the crowd that went to the Capitol on January 6, 2021, behaved violently, most of the people, including Mr. Homol, did not.  The government did not allege, nor did any evidence show, that Mr. Homol assaulted any police officers, damaged any property, or committed any other violent act.

3.      Paragraph 12 of the presentence report goes on to state that "Homol was often directly opposite the police line and faced the officers, even while others in the mob attacked the officers."  The video evidence presented at trial showed one instance of Mr. Homol standing directly in front of the officers' line on the West Plaza, two concrete steps down from the police.  Govt. Tr. Exh. 721.  No one in the crowd is seen attacking or attempting to breach the police line at this point.  Most of the video evidence from the West Plaza shows Mr. Homol further back, usually with at least two or three rows of protesters between him and the police line.

4.      Paragraph 13 states, "Homol rushed past the police line as officers physically struggled with rioters. . . Celebrating his success, Homol raised his hands in triumph. . . " Mr. Homol objects to the characterization of his conduct as "celebrating."  The video of Mr. Homol with his hands up was taken from the body camera of an officer who was quickly approaching Mr. Homol.  The officer was holding a cylindrical object in his right hand which he raised as he got closer to Mr. Homol.  At the same time, other officers were pepper spraying protesters near Mr. Homol.  Govt. Tr. Exhs. 401.1, 401.4, 406.1.  As Mr. Homol testified, he raised his hands so the police would know he was not a threat.  Sgt. Anthony Alito of the Metropolitan Police Department, whose body camera recorded Govt. Exh. 401, confirmed that he did not view Mr. Homol as a threat and moved past him to assist other officers confronting aggressive protesters.

5.      Paragraph 14 explains, "At approximately 2:44 p.m., Homol entered the Capitol building through the Upper West Terrace Doors."  Mr. Homol wishes to add that he stood in line outside of this door with other protesters until the officers standing in the

doorway walked away, allowing the protesters to enter.  None of the protesters standing in this line were engaging in assaultive or threatening behavior.  As Mr. Homol began to walk in, he reconsidered, turned around, and began to walk out, but then changed his mind again and walked into the Capitol with the other protesters.  Def. Tr. Exh. 8; Govt. Tr. Exh. 302.

6.      Paragraph 16 states, "Homol did not leave the Rotunda even while officers made oral requests and physically gestured for rioters to exit."  The video evidence presented at trial did not show officers in the Rotunda making such requests before they formed a line and began pushing the protesters towards an exit on the east side of the building.

7.      Paragraph 16 goes on to state that "an officer attempted to take away Homol's PVC pipe flagpole due to its potential to be used as a weapon.  Homol refused to give his flagpole and engaged in a brief tug-of-war with the officer before having the PVC pipe pulled out of his hands."  First, Mr. Homol wishes to clarify that at no time on January 6, 2021, did he ever use or intend to use his flagpole as a weapon.  Further, as he testified at trial, he did not refuse to give his flagpole to the officer.  When the officer attempted to take the flagpole from Mr. Homol, Mr. Homol was in the frightening crush of protesters being pushed out of the Rotunda by the police.  His back was to the officer, so he did not know who was attempting to take his flag.  When he turned and realized it was an officer, he released the flag.

8.      Paragraph 17 states, "Homol was standing among a group of rioters who attempted to push their way back inside the east Rotunda doors. . ."  As the evidence at trial showed, Mr. Homol was standing to the side of the door waiting to see if the police would

4

return his flag, something he discussed with various officers.  He never attempted to push

his way back into the Rotunda.

9.    The quote contained in paragraph 18(c) is incomplete.  The actual quote is "I

heard in the crowd.  This was a warning next time it won't be so nice."  Govt. Exh. 707.

      b.      *Objections to sentencing factors*

1.    *Acceptance of Responsibility.* Paragraph 21 under "Adjustment for

Acceptance of Responsibility" states, "The defendant pled guilty to Count 5 of the

Indictment but put the government to its burden of proof at trial for the remaining counts of

the Indictment."  Thereafter, paragraph 41 under "Offense Level Computation" states that

"the defendant has not clearly demonstrated acceptance of responsibility for the offense"

and declines to reduce his offense level by 2 levels pursuant to USSG §3E1.1.

Mr. Homol proceeded to trial due to the government's insistence that he plead guilty

to the felony of Obstructing an Official Proceeding charged in Court 1 of the Indictment, a

charge not supported by the evidence as the Court's verdict confirmed.  *See* Statement of

Defense Counsel Regarding Plea Officer Communications, Dkt. 76.  Application Note 2 to

§3E1.1 states:

> This adjustment is not intended to apply to a defendant who puts the Government
> to its burden of proof at trial by denying the essential factual elements of guilt, is
> convicted, and only then admits guilt and expresses remorse.  Conviction by trial,
> however, does not automatically preclude a defendant from consideration for such
> reduction.  In rare instances, a defendant may clearly demonstrate an acceptance of
> responsibility for his criminal conduct even though he exercises his constitutional
> right to a trial.  This may occur, for example, where a defendant goes to trial to
> assert or preserve issues that do not relate to factual guilt (*e.g.* to make a
> constitutional challenge to the applicability of a statute to his conduct).  In each
> instance, however, a determination that a defendant has accepted responsibility will
> be based primarily on pre-trial statements and conduct.

At trial and in his statement to U.S. Probation, Mr. Homol fully admitted his unlawful conduct at the Capitol and expressed sincere regret for his behavior and poor judgment.  He pled guilty to Count 5 and only raised pure legal challenges at trial regarding the applicability of the remaining misdemeanor charges which were predicated on the same conduct as Count 5.[1]  The only "fact" that Mr. Homol contested was whether he committed any corrupt act sufficient to support the felony charge on which he was tried. As Mr. Homol was acquitted of that charge, it cannot follow that his challenge to it constituted a failure to accept responsibility. Accordingly, Mr. Homol should receive a 2-level reduction for accepting responsibility for his actions on January 6, 2021.

2.      *Offense involving physical contact.* Paragraph 38 under "Offense Level Computation" increases the offense level calculation by 3 levels based on an allegation that Mr. Homol's offense "involved physical contact."  USSG §2A2.4(b)(1)(A).  The evidence established that Mr. Homol never initiated physical contact with any officer.  Any contact that occurred was initiated by the police and not resisted by Mr. Homol.  For example, he was led and then pushed by an officer back into the crowd at the West Plaza, an officer grabbed and pulled his flagpole at the Rotunda, and an officer pulled him off a bench in the Rotunda and out an exit.  The application notes to §2A2.4 do not further explain the appropriate scope of "physical contact." However, given the substantial offense level increase called for, common sense dictates that the defendant must be the one responsible

---

[1] For example, Mr. Homol filed a pretrial motion challenging the misdemeanor charges as improperly multiplicitous. Also, at the Motion for Judgment of Acquittal, Mr. Homol argued that the evidence failed to establish he had actual knowledge of the Vice President's presence at the Capitol, a necessary element of 18 U.S.C. § 1752.  He also argued that the evidence was insufficient to establish his conduct impeded or disrupted government business because Congress was adjourned while Mr. Homol was in the Capitol.

for the contact and that more than mere incidental contact must occur. Otherwise, anyone who was arrested and handcuffed by an officer could receive the 3-level enhancement.

This was the conclusion reached in *United States v. Sanders*, 2006 U.S. Dist. LEXIS 31759\*; 19 Fla. L. Weekly Fed. D 949 (N.D.Fl. 2006), an appeal to the district court from a magistrate judge bench trial. The defendant in *Sanders* was convicted of forcibly assaulting, impeding, and interfering with an officer in violation of 18 U.S.C. § 111(a)(1). On appeal, he argued that the enhancement under §2A2.4(b)(1)(A) should not apply because only the arresting officers initiated physical contact. The court rejected this argument, reasonably explaining that the evidence established that the defendant pushed his body against the arresting officers and attempted to strike them with his hand and elbow. Such contact was not solely initiated by the officers nor merely incidental. *Citing United States v. Collins,* 937 F.2d 617(10th Cir. 1991) (unpublished opinion); *United States v. Hill,* 996 F.2d 1228 (9th Cir. 1993)(unpublished opinion)(cases upholding application of the enhancement when defendants resisted arrest by struggling with officers before being overpowered and restrained).

None of the offenses for which Mr. Homol was convicted include physical contract as an element of the offense, and no evidence of physical contact sufficient to warrant application of this guideline was produced at trial. As Mr. Homol did not initiate any contact with an officer, did not struggle with an officer, and any contact was incidental to his offenses, the physical contact enhancement should not be applied.

3.      *Correct sentencing guidelines calculation.* If the foregoing objections to Mr. Homol's sentencing guidelines calculations are accepted, his offense level would be 6, his

criminal history would be I, and the recommended sentencing range would be 0 to 6 months,

Zone A.

**II.      Position Regarding Sentence**

The sentencing guidelines are advisory and are just one factor the Court must weigh

in determining a just sentence. *United States v. Booker*, 543 U.S. 220 (2005). Under *Booker*,

courts must "tailor the sentence" by examining the factors listed in 18 U.S.C. §3553(a): (1)

the nature and circumstances of the offense and the history and characteristics of the

defendant, (2) the kinds of sentences available, (3) the guideline range, (4) the need to avoid

unwarranted sentencing disparities, (5) the need for restitution, and (6) the need for the

sentence to reflect the seriousness of the offense, to afford adequate deterrence, to protect

the public from further crimes by the defendant, and to provide the defendant with needed

correctional treatment. Based upon these factors, the Court should impose a sentence that is

"sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in

18 U.S.C. §3553(a)(2).

      *a.      Mr. Homol's personal characteristics and family background*

Mr. Homol was born on December 14, 1998, in Orlando, Florida.  He grew up in

Cocoa Beach Florida with his mother and father, Hanna and Donald Homol, and his sister

Jessica.  Dillon's father served in the Air Force and then operated a limousine company

while his mother stayed home to raise Mr. Homol and his sister.

Mr. Homol enjoyed a happy childhood. He participated in sports and was a solid,

steady student in school.  He enjoyed a close relationship with his father and particularly

enjoyed working with him on home projects while growing up. Mr. Homol's father passed

away nine years ago after a battle with cancer believed to have been brought on by his exposure to Agent Orange during his combat service in the Vietnam war.

At the time of his father's death, Mr. Homol was fifteen years old. After his father's passing, Mr. Homol felt a great responsibility to be "the man of the house." As a teenager, he did all he could to support his mother and keep their home in good order. He is now twenty-five years old and continues to live with his mother, Hanna (60), at their single-family home in Cocoa Beach. It is a modest three-bedroom home where Mr. Homol has resided his entire life. Mr. Homol is employed fulltime and provides substantial financial and emotional support for his mother and their home.

Mr. Homol has one sister, Jessica Homol (30), who lives with her family in Tennessee. He also has one paternal half-brother, David Homol (55) who lived with his family in North Carolina at the time of this offense. Mr. Homol did not share a close relationship with David until David moved to Florida approximately two years ago. As Dillon explained during his trial, a key factor in his decision to accept David's invitation to travel to Washington, D.C., and attend the January 6 rally was the opportunity the trip would provide to improve his relationship with his brother. Today, Mr. Homol enjoys strong support from all his family members. He has never married and has no children.

Mr. Homol has a solid education and employment history. Mr. Homol graduated from Merritt Island High School in 2017. Afterwards, he studied criminal justice and business at Eastern Florida State College where he worked towards an associate degree. After the school transitioned to online classes during the COVID-19 pandemic, Mr. Homol decided to pause his classwork and begin fulltime employment. He planned to return to

school once in-person classes resumed, but then the legal consequences of this case arose. Given the uncertain impact this case posed for his future, Mr. Homol decided to further delay reenrolling in classes until his legal obligations are sufficiently met to allow him to complete his remaining classes without interruption.  He is approximately one semester shy of completing his associate degree.  Mr. Homol has always enjoyed construction projects which he began doing with his father and continued performing for his neighbors and at work, so, once he completes his associate degree, he would like to pursue a general contractor's license.

Mr. Homol has been employed full-time as a computer numerical control operator at HM Industries since 2018. He earns approximately $2,300 per month. While in high school and at the start of college, Mr. Homol worked part-time at Florida Seafood as a food runner earning tips.

Recently, Mr. Homol interviewed for a position with a defense contractor supporting the work they do at Cape Canaveral.  The company is impressed by Mr. Homol's strong reputation at HM Industries, but given the uncertainly of his current legal situation, the company cannot offer Mr. Homol a position at this time.  However, they have indicated that once a final resolution is reached, they hope to bring him on board.  His experience as a machinist is a skill set in high demand.

Mr. Homol has never before been arrested and has no prior criminal history.  He is devoted to his family and has strong roots in his community.  The high regard in which others hold him despite his young age is strongly articulated in the letters of support accompanying this memorandum.  Many of his neighbors consider him family.  His

impressive willingness to voluntarily help repair homes, do handywork, and prepare his neighborhood for hurricanes was noted in several of the letters.

The conduct underlying Mr. Homol's convictions is completely out of character for him. He acted in conjunction with a crowd of thousands who were motivated by the words and actions of President Trump and his key advisors. Such a historically unique circumstance is highly unlikely to be repeated. There is no reason for the Court to believe that Mr. Homol's future will involve anything but lawful behavior, hard work, and devotion to family because, but for January 6, those have been and continues to be the guiding principles of his life.

b.      *The nature and circumstances of the offense*

Mr. Homol presented the details of his conduct on January 6, 2021, during his trial testimony and in his statement to the probation office, so they do not need to be repeated in detail here. Mr. Homol does wish, however, to emphasize his motivation for coming to Washington, D.C, on January 6, 2021. Mr. Homol (Dillon) was invited on the trip by his half-brother, David Homol. At the time, Dillon was twenty-two years old, and David was in his mid-fifties. Dillon welcomed the opportunity to spend time with David. Given their age differences, Dillon had never developed a close relationship with David. He saw this trip as an opportunity to change that. Also, he was excited to visit Washington, D.C., a city he had never seen before. He and David planned to visit the museums and monuments, including Arlington National Cemetery, something they wanted to do to honor their father.

Dillon also planned to attend the rally being held on the Ellipse. He wanted to show his support for President Trump and protest what he honestly believed was an improperly

called election.  He made no preliminary plans to go to the Capitol on January 6.  Indeed, the text messages introduced at trial show that Dillon was strongly focused on getting to the rally to see President Trump speak.  Only after President Trump instructed the crowd on the Ellipse to go to the Capitol did David and Dillon decide to join the thousands of protesters making the two-mile walk.

As Dillon approached the Capitol and saw the events unfolding, the emotions of the crowd overcame his better judgment, and he allowed himself to cross over from the peaceful protest he intended into illegal conduct constituting trespass and disorderly conduct.  He deeply regrets this failure on his part.  Even while engaging in this conduct, one can see Mr. Homol's better judgment working to gain control.  For example, as he began to enter the Capitol, he hesitated and turned around.  When the police began pushing the protesters out of the Rotunda, Mr. Homol quickly retreated from their line.  Once near the exit door, he withdrew to a corner by the stairs and engaged in civil conversations with various police officers.  He never committed in any acts of violence or vandalism.  Such conduct is simply not a part of who he is.

c.      *The need to avoid unwarranted sentencing disparities*

To date, over 1100 people have been arrested for their involvement in the January 6 riot at the Capitol, so there is ample data for the Court to examine in determining how other protesters similar to Mr. Homol have been sentenced.[2]  Of those arrested, defense counsel identified 477 who have been convicted under 18 U.S.C. § 1752 and/or 40 U.S.C. § 5104,

---

[2] The Government maintains its updated database online at https://www.justice.gov/usao-dc/capitol-breach-cases.

the same statutes as Mr. Homol. Of those, counsel identified 168 who received sentences imposing only probation, i.e., no incarceration, intermittent confinement, or home detention. Thus, one cannot say that a sentence imposing only a period of probation with conditions upon Mr. Homol would be in anyway disparate.

Further, if the Court were to accept the sentencing guidelines calculation requested by Mr. Homol, a probationary sentence would be within the recommended guidelines range and thus presumptively not disparate. Even if the Court adopts the calculation set forth in the presentence report, a sentence of probation would still be appropriate under the guidelines due to Mr. Homol's status as a Zero-Point Offender under USSG §4C1.1. *See* PSR ⁋ 68 citing USSG §5C1.1, n. 10.

> d.   *The need for the sentence to reflect the seriousness of the offense, to afford adequate deterrence, to protect the public from further crimes by the defendant*

Mr. Homol fully acknowledges the seriousness of his conduct and the events that unfolded on January 6, 2021. He wishes he had played no part in them but understands that he must be held responsible for his conduct. Nevertheless, he has only been found guilty of misdemeanors involving unlawful picketing, trespass, and disorderly conduct. Given Mr. Homol's lack of any prior record, his solid work history, his supportive family, and his acknowledgement of wrongdoing, a sentence which does not impose incarceration is appropriate. In addition to his history of lawful conduct, Mr. Homol has fully complied with his lengthy period of supervised release. He has demonstrated that he will not repeat any unlawful conduct, that deterring him from future wrongdoing is not a concern, and that he poses no future danger to the public. The broader concept of deterring others through one

13

individual's sentence is difficult, if not impossible, to measure. However, given limited scope of Mr. Homol's behavior on January 6, the numerous arrests that have been made, and the substantial sentences that have been imposed on the individuals who, unlike Mr. Homol, engaged in violence, there is no reason to believe that a sentence of probation will be insufficient to address all aspects of deterrence.

## III.    Conclusion

Based upon the foregoing and such additional information as may be presented in open court, Mr. Homol requests that the Court impose a sentence requiring him to serve a period of probation with such terms and conditions as the Court and the Probation Office deem appropriate. Such a sentence will be "sufficient but not greater than necessary" to achieve the purposes set forth in 18 U.S.C. §3553(a)(2).

Dated:  January 8, 2024                    Respectfully Submitted,


/s/ James W. Hundley
James W. Hundley, DDC Bar # VA049
William T. DeVinney, D.C. Bar # 488539
Briglia Hundley, P.C.
1921 Gallows Road, Ste 750
Tysons Corner, VA 22182
Phone: (703) 883-0880
Fax: (703) 942-8092
Email:  jhundley@brigliahundley.com
Email:  wdevinney@brigliahundley.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been served via the Court's electronic filing system on this 8ᵗʰ day of January, 2024, to:

Elizabeth Nash Eriksen
Trial Attorney, Detailee
VA Bar No. 72399
DOJ-Criminal Division
1301 New York Avenue
8th Floor
Washington, DC 20005
(202) 616-4385
Elizabeth.Eriksen@usdoj.gov

Nathaniel K. Whitesel
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
(202) 252-7759
nathaniel.whitesel@usdoj.gov

*/s/ James W. Hundley*_____
James W. Hundley