**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-50 (JMC)** |
| **v.** | : | |
| | : | |
| **DILLON HOMOL,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Dillon Homol to 24 months of incarceration, the low end of the applicable Guidelines range of 24 to 30 months as calculated by the government, 1 year of supervised release, 60 hours of community service, a $70 special assessment, and $500 in restitution.

### I.    Introduction

Defendant Dillon Homol, 25 years old, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

A bench trial began in this case before the Court on September 27, 2023. On September 28, 2023, prior to the Court's verdict, the defendant, Dillon Homol, pled guilty to one of the misdemeanor counts charged against him: Count 5. On September 29, 2023, at the conclusion of that bench trial, the Court found defendant Dillon Homol guilty of three of the four remaining counts charged against him. The counts of conviction are:

| | |
|---|---|
| Count 2: | Entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1); |
| Count 3: | Disorderly and disruptive conduct in a restricted building or grounds, 18 U.S.C. § 1752(a)(2); |
| Count 4: | Disorderly conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); and |
| Count 5: | Parading, demonstrating, or picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G). |

The Court found Homol not guilty beyond a reasonable doubt of Count 1: obstructing an official proceeding, 18 U.S.C. § 1512(c)(2).

The government's recommendation is supported by Homol's (1) preparations for violence, including bringing a PVC flagpole and wearing body armor; (2) disregard for plain Capitol restrictions and the innumerable acts of violence against officers that he observed throughout that day; (2) presence at the very front of the mob on the West Plaza, including being one of the first rioters to break through the police line just prior to the line's complete collapse; (3) interactions with police, including yelling at officers, engaging in acts that forced police to make physical contact with him, and physically fighting with an officer over his flagpole in the Rotunda; (4) continued efforts to re-enter the Capitol through the East Rotunda Doors after already being one

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

of the last rioters to be ejected from that portion of the building; and (5) less than forthright admissions to the FBI during a January 2021 phone interview, the Court during the bench trial, or both, concerning his entry into the Capitol and participation in the riot.

The Court must also consider that Homol's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Homol's crime support a sentence of 24 months of incarceration, 1 year of supervised release, 60 hours of community service, a $70 special assessment, and $500 in restitution in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the Statement of Facts filed with the Complaint in this case, ECF No. 1-1, for a general summary of the January 6, 2021 attack on the U.S. Capitol.

### Homol's Role in the January 6, 2021 Attack on the Capitol

Homol was repeatedly at the forefront of the mob on January 6, 2021. He was one of the first rioters to break through the West Plaza police line and was one of the very last to be forced out of the East Rotunda Doors. This first-through-last-out status highlights how Homol's conduct was tied directly to the riot's aim to halt the certification and the operation of American democracy.

Prior to January 6, Homol made calls for war and death in response to the fraud he perceived in the 2020 Presidential Election. On December 23, 2020, Homol posted a Facebook comment describing perceived election fraud as "an act of treason" and "an act of war[.]" That same day, he posted another comment stating, "these fraud loving democrats should be hung for

treason." On January 1, 2021, Homol posted a statement to a group page on Facebook called "Joe Biden IS NOT MY PRESIDENT" that "WE LOVE PRESIDENT TRUMP IN FLORIDA, AND WE CANT BACK DOWN!" Government Trial Exhibit ("GEX") 603.

Homol traveled with his brother, David Homol, to Washington, D.C., to attend the "Stop the Steal" rally. Leading up to the rally, the brothers prepared for a potential fight. They brought PVC pipes to use as flagpoles and discussed the pipe's potential use as a weapon. GEX 706. Homol wore a camouflage backpack, a blue and black plaid long sleeve button up shirt, blue jeans, brown and black boots, and a red "TRUMP" hat. The two brothers also wore protective vests and eyewear. Prior to the rally, Homol took a photo in front of the Capitol building that showed the full extent of the restrictions that were put in place ahead of the certification proceeding. *See* Image 1.



*Image 1 (GEX 712 (Cropped))*

After attending the rally, the two brothers marched together back to the Capitol building. While en route, Homol livestreamed himself via Facebook Live. He repeatedly shouted that he and the mob were "storming the Capitol building" and pointed out that "they're counting the electorals [sic] in there right now—and we stormed it." GEX 605.3. Homol claimed that the "cop's ain't on our side," but "they can't stop us all." GEX 605.3. Homol then entered the Capitol's west front—defying the barriers he observed at the Capitol prior to the rally and that he filmed during his Facebook Live post. *See* Image 2.



*Image 2 (screenshot from GEX 605.3)*

Homol and the rapidly growing mob eventually reached the Capitol's West Plaza. There, Homol saw police and rioters fighting over the establishment and reinforcement of a police

defensive line on the plaza. He took advantage of officers' physical engagements with other rioters to reposition himself at different points in the crowd, eventually reaching locations situated directly in front of United States Capitol Police ("USCP") and Metropolitan Police Department ("MPD") officers. Once he was right up against the police line, Homol verbally berated the officers as rioters around him used their own chemical sprays against police and hurled objects at them as depicted in GEXs 506, 720, 719, and 722.

MPD Sergeant Anthony Alioto and USCP Inspector (now Deputy Chief) Thomas Loyd testified about how, after actively defending their line for over an hour, hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them. Sgt. Alioto's testimony also showed that, because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. Homol contributed to that difficulty.

At approximately 2:28 p.m., the mob on the West Plaza surged forward. Still at the front of the crowd, Homol took advantage of the officers' efforts to defend themselves from the escalated assault and rushed through the police line. Once on the other side—behind the police— Homol celebrated his success, raising and pumping his hands up and down in triumph. *See* Image 3.



*Image 3 (GEX 401.4)*

Eventually, a police officer noticed Homol behind him. In order to move Homol back to the other side of the police line, the officer had to grab Homol and push him back into the crowd. GEX 510. But by this time, the situation had become untenable for the police. Combined with openings in the perimeter and breaches of the building by other rioters, several other large gaps appeared in the West Plaza police line, and officers were forced to fall back. Still, Homol remained at the mob's front. He took advantage of the crowd's progress in seizing control of the West Plaza and Lower West Terrace to move closer to the Capitol building.

At approximately 2:44 p.m., Homol entered the Capitol building through the Upper West Terrace Door—an emergency exit with a blaring alarm. GEXs 726, 727. He then made his way to the hallway outside the Old Senate Chamber on the building's second floor, where he joined a crowd berating officers guarding further access to the hallway. In a video taken by Homol in this hallway, he could be heard threatening and otherwise trying to convince the officers to abandon their guard. For example, despite having seen multiple assaults on police on the West Plaza, Homol shouted that "We're with you," but noted, "Look, nobody's gotten hurt, yet." GEX 729. Homol also referenced the American Revolution, yelling, "We're sorry you gotta deal with this, but it's a

Trump country, and we're fighting for it like it's 1776." Homol's video also depicted an officer repeatedly asking the rioters, including Homol, to voluntarily leave the building. In response, Homol did not leave and shouted at the officer that he "swore on the constitution."

Homol eventually moved to the Rotunda, where, at approximately 3:13 p.m., MPD and USCP officers were attempting to clear rioters from the building. Homol did not leave the Rotunda even while officers made oral requests and physically gestured for rioters to exit. The police eventually were forced to begin physically pushing rioters out the Rotunda. *See* GEX 512.1. An officer attempted to take away Homol's PVC pipe flagpole due to its potential to be used as a weapon. Homol refused to give up his flagpole and—facing the officer the entire time—engaged in an approximately 10-second tug-of-war with the officer before having the PVC pipe pulled out of his hands. *See* Image 4.



*Image 4 (screenshot from GEX 409.1)*

At approximately 3:36 p.m., officers pushed Homol out the East Rotunda Doors. Homol was among the last of the rioters to exit from those doors. But Homol did not leave the area. Instead, he remained just outside the Rotunda doors as officers blocked the entrance with a riot shield. At approximately 3:42 p.m., Homol was standing among a group of rioters who attempted

to push their way back inside the Rotunda doors when officers sprayed the rioters, including Homol, with a chemical irritant spray. *See* GEXs 304 (approx. video timestamp 22:45), 514.1. While Homol moved away from the doors, he remained on the Capitol's east steps, his pride in his crimes apparent. *See* Image 5; *see also* GEX 516.1.



*Image 5 (GEX 715)*

After the events of January 6, 2021, Homol communicated extensively with others regarding his participation in the riot. He described the riot to multiple people via text message as "absolutely legendary." GEXs 703, 708. He also called it "insane" and claimed, "we made a statement." GEX 708. In other messages, he spread false information about the riot. *E.g.* GEX 702 ("The cops let us in lmao"); *see also* GEX 705 ("It's crazy how set up people can be. . . . Nothing is wrong with it but people can adjust clips the way they want to. To make people look bad."). Yet in others, he discussed being shot with rubber bullets and being flashbanged. GEX 708.

*Homol's FBI Interview*

On January 28, 2021, Homol was interviewed by FBI agents over the telephone. During the interview, Homol admitted to traveling to D.C., attending the rally, and going inside the Capitol. According to Homol, he watched multiple videos before arriving at the Capitol that depicted an initial wave of rioters tearing down barriers and advancing on the building. He also claimed that there were no barriers of any sort when he arrived at the Capitol.

Homol also stated that he did not see much activity both inside and outside of the Capitol building. He claimed he felt invited into the building because the doors were open and no one inside was being told to leave. However, Homol also claimed that he was forced into the building by the crowd.

*Homol's Testimony*

Homol testified in his own defense during trial. During his testimony, Homol generally admitted what was demonstrated by video while qualifying or minimizing his actions and observations that otherwise reflected poorly on his conduct. Homol described how he saw members of the mob "engaging" with officers outside the Capitol and "follow[ing] the maze" to the front of the mob, where he "tried to stay out of physical contact or physical harm." Sep. 28, 2023 Tr. at 161. Homol admitted that he saw members of the crowd using flagpoles as weapons against the police. *Id.* at 208. He claimed he broke through the police line in order to avoid the pushing crowd and that he did not celebrate breaking through the police line; instead he moved "with [his] hands up, as to say, I'm no threat." *Id.* at 162. But the video indicates otherwise. *See* GEX 401.1. Similarly, regarding his entry into the building, Homol admitted that "I probably knew I shouldn't have been [inside the Upper West Terrace Door]"—but, in explaining why he moved further into the building anyway, Homol claimed he was "just follow[ing] the crowd." Sep. 28,

2023 Tr. at 211.  Furthermore, a large portion of Homol's direct testimony was spent justifying his lengthy attempts to remain inside the East Rotunda Doors and, later, reenter the Capitol despite the orders and physical compulsions of police—all because he wanted to get back a flag pole worth "probably 20 bucks."

During his testimony, Homol also avoided admitting responsibility for many of the statements he made on and about the seriousness of January 6, 2021, claiming that "I said a lot of things that I truly don't mean[,] and I let the influence of others get to the best of my ability." *Id.* at 204:4–6. For instance, Homol testified that he did not know that "1776" meant, despite frequently and confidently chanting it while in the mob against the West Plaza police and invoking fighting "like it's 1776" while shouting at officers guarding the Old Senate Chamber hallway. *See id.* at 212. Similarly, Homol claimed he did not know about the Three Percenters movement, despite invoking them in messages with others about January 6. *Id.* at 222. Moreover, Homol also testified a message he sent after January 6 describing how he was "shot with rubber bullets[,] . . . was a complete and utter lie." *Id.* at 220.

At the conclusion of his testimony, Homol admitted that, on January 6, 2021, he did not believe he was allowed to go into the Capitol. *Id.* at 233.

### III.   Statutory Penalties

Homol now faces a sentencing for violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). As noted by the U.S. Probation Office, Homol faces the following maximum penalties:

| Count | Offense | Max Prison Term | Max Term of Supervised Release | Max Fine | Mandatory Special Assessment |
|---|---|---|---|---|---|
| 2 | 18 U.S.C. § 1752(a)(1) | 1 year | 1 year | $100,000 | $25 |
| 3 | 18 U.S.C. § 1752(a)(2) | 1 year | 1 year | $100,000 | $25 |
| 4 | 40 U.S.C. § 5104(e)(2)(D) | 6 months | n/a | $5,000 | $10 |
| 5 | 40 U.S.C. § 5104(e)(2)(G) | 6 months | n/a | $5,000 | $10 |

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government calculates the applicable Sentencing Guidelines as follows:

### a.    Count Two: 18 U.S.C. § 1752(a)(1), Entering and Remaining on a Restricted Building or Grounds

The Statutory Index lists two guidelines for this offense, U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and § 2B2.3 (Trespass).  Since Section 1752(a)(1) is a trespass statute, § 2B2.3 is "the guideline most appropriate for the offense conduct charged in the count for which the defendant was convicted." Appendix A, Introduction.

| Base Offense Level: | 4 | U.S.S.G. § 2B2.3(a) |
|---|---|---|
| Specific offense characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." |

| | | |
|---|---|---|
| | | On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross Reference | | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." Although Homol was acquitted of *actually violating* 18 U.S.C. § 1512(c)(2) as charged in Count One where proof beyond a reasonable doubt is required, the trial evidence was nevertheless sufficient to prove, by a preponderance, that he *intended* to obstruct a proceeding before Congress, to wit: the January 6, 2021 Congressional certification of the 2020 Electoral College vote for President. |
| Base Offence Level | 14 | U.S.S.G. § 2J1.2 |
| Specific offense characteristic | +3 | U.S.S.G. § 2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice."<br><br>For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress, § 1515(a)(1)(B).<br><br>The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted for almost six hours while legislators were physically evacuated for their own safety.[2] |
| **Total** | **17** | |

The cross-reference under U.S.S.G. § 2B2.3(c), which applies when the offense is committed with the intent to commit another felony, applies here. Despite Homol's acquittal on Count One, where proof beyond a reasonable doubt was required, this Court should find, by the applicable preponderance standard,[3] that the evidence shows Homol's conduct before, on, and

---

[2] *See, e.g., United States v. Calhoun*, 21-CR-116*; United States v, Reffitt*, 21-cr-32.

[3] Despite considering a proposed amendment that would have prohibited the use of acquitted conduct in applying the Guidelines, this year, the Commission decided not to adopt that amendment. Thus, acquitted conduct remains an appropriate consideration in applying the

after January 6 was all intended to further his goal of obstructing Congress's certification of the election, conduct that constitutes a violation of 18 U.S.C. § 1512(c)(2).

The evidence at trial established by a preponderance that Homol attempted to, and did, knowingly obstruct an official proceeding. Homol was fully aware that the Electoral College Vote was set to take place inside the U.S. Capitol on January 6, 2021, GEX 605.3, and it is clear that the certification could not continue with the mob besieging its doors, *see United States v. Grider*, 651 F. Supp. 3d 1, 15 (D.D.C. 2022). Indeed, the Court's verdict included findings that Homol (1) "made statements that they are counting the electoral votes and that he was storming the Capitol[;]" (2) engaged in conduct designed to cause the "overturn [of] the election[;]" (3) "intend[ed] to disrupt the orderly conduct of business" and "influence the voting process[;]" and (4) engaged in that unlawful conduct "willfully and knowingly[.]" 9/29/2023 Tr. at 41–43. In acquitting the defendant, the Court found only that the government failed to prove beyond a reasonable doubt that the defendant "corruptly" obstructed or impeded the official proceeding. *See id.* at 44. But under a preponderance of the evidence standard, the evidence nevertheless showed that the defendant intended to disrupt the proceeding by corrupt "independently unlawful means or unlawful purpose," *id.* at 44, namely, through willful trespass violating clear restrictions, willful

---

Guidelines. *See* U.S. Sentencing Comm'n, Proposed Amendments to the Sentencing Guidelines 211 (Feb. 2, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendlyamendments/20230201_RF-proposed.pdf; U.S. Sentencing Comm'n, Amendments to Sentencing Guidelines (Apr. 27, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf. *See also United States v. Watts*, 519 U.S. 148, 156 (1997) ("an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof."); *United States v. Jones*, 744 F.3d 1362, 1369 (D.C. Cir. 2014) (citing, *e.g., United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[B]inding precedent of this court establishes that" "sentencing based on acquitted conduct" and "enhancing a sentence within the statutory range based on facts found by the judge, as opposed to the jury, do[ ] not violate the Sixth Amendment.").

disruptive conduct that impaired the police's ability to protect the Capitol, willful parading, and/or for the purpose of improperly reversing the outcome of the election. *See, e.g.*, *United States v. Sheppard*, No. 21-203 (JDB), 2023 U.S. Dist. LEXIS 198275, at *16 (D.D.C. Nov. 3, 2023); *United States v. Hostetter*, No. 1:21-cr-392-1-RCL, 2023 U.S. Dist. LEXIS 124989, at *17 (D.D.C. July 13, 2023); *United States v. Grider*, 651 F. Supp. 3d 1, 16 (D.D.C. 2022). Homol knew the natural and probable consequences of his conduct would be to obstruct and delay the proceeding and he willfully engaged in that conduct.  Thus, by a preponderance of the evidence, Homol knowingly committed the offense charged in Count One with intent to obstruct the certification proceeding on January 6, 2021, and he did so corruptly.

This Court would not be the first to apply the U.S.S.G. § 2B2.3(c) cross-reference even after an acquittal of a § 1512(c)(2) count.  Defendant Kenneth Joseph Thomas was convicted of civil disorder (§ 231), assaulting police (§ 111(a)), and remaining in a restricted building or grounds (§ 1752(a)(1)), yet was acquitted of obstruction of an official proceeding (§ 1512(c)(2)). In that case, the government sought a cross-reference to U.S.S.G. § 2B2.3(c), which the court granted.  *See United States v. Thomas*, 21-cr-00552 (DLF).

Similarly, other judges in this district have applied the U.S.S.G. § 2B2.3(c) cross-reference based on similar conduct, even when the underlying 18 U.S.C. § 1752(a)(1) offense was a misdemeanor (although the defendants in those cases were not  acquitted of § 1512(c)(2)). *See, e.g., United States v. Anthony Williams*, 21-cr-00377 (BAH), 9/16/2022 Sentencing Tr. at 49-51 (defendant also found guilty of § 1512(c)(2)); *United States v. Bledsoe*, 21-cr-00204 (BAH), 10/21/ 2022 Sentencing Tr. at 76-78 (defendant also found guilty of § 1512(c)(2)); *compare with United States v. Nicholas Rodean*, 21-cr-00057 (TNM), 10/26/2022 Sentencing Tr. at 5-11 (defendant not charged with § 1512(c)(2); court declined to apply the § 2B2.3(c) cross-reference to the

§ 1752(a)(1) misdemeanor conviction based on the case-specific facts—where in the court's assessment, the defendant did not intend to obstruct—but noted, "I think in many situations with many individuals the sum of the various pieces of evidence that the Government put forth at trial would certainly make out the guideline for obstruction of administration of justice [under the cross-reference]").

As succinctly explained by Chief Judge Howell in *Bledsoe*:

> The guideline at 2B2.3 applies to Count 2, charging: Entering and remaining in a restricted building or grounds, under 18 U.S.C. Section 1752(a)(1). This guideline provides a base offense level of 4 under the Guideline at Section 2B2.3(a). Two offense levels are added because the trespass occurred at a restricted building or grounds, under the Guideline at 2B2.3(b)(1)(A)(vii). It is then adjusted up to 25 offense levels pursuant to the guideline at 2B2.3(c)(1) and 2X1.1(a) because the offense was committed with the intent to commit the felony obstruction offense which adds up to 25 offense levels [pursuant to U.S.S.G. §2J1.2(a)] [. . .].

*United States v. Bledsoe*, 21-cr-00204 (BAH), 10/21/ 2022 Sentencing Tr. at 76-77 (defendant also found guilty of § 1512(c)(2)).

As in these other cases, § 2X1.1(a) applies, and so the base offense level is determined by application of § 2J1.2, as set forth above.

### b. Count Three: 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds

The U.S. Probation Office correctly calculated the offense level for Count Three under the Sentencing Guidelines as follows:

*Count Three* (18 U.S.C. § 1752(a)(2)):

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.4(a)) | 10 |
| Specific Offense Characteristics (U.S.S.G. § 2A2.4(b)(1)(A)) (physical contact) | +3 |
| Total | 13 |

16

*See* PSR[4] ¶¶ 37–42.[5]

### c.   Grouping Analysis

Under U.S.S.G. § 3D1.2, "closely related counts" group. Counts Two (entering and remaining in a restricted area) and Three (disorderly and disruptive conduct in a restricted area) group because both counts involve the same victim (Congress) and the same criminal act or transaction or two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. *See* U.S.S.G. § 3D1.2(a) and (b). Because Count Two has a higher offense level, the offense level for the group is the offense level for Count Two, which is 17. *See* U.S.S.G. § 3D1.3(a).[6]

### d.   Section 4C1.1

The government disagrees with the Probation Office that Homol is entitled to a reduction in the combined offense level by operation of U.S.S.G. § 4C1.1. That new provision provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Probation has applied that two-level decrease for Homol's guideline calculation, resulting in a total offense level of 11, rather than 13.

Section 4C1.1 does not apply in this case, and the proper total offense level is 17. For one, Homol used violence or a credible threat of violence in connection with the offenses of conviction. *See* U.S.S.G. § 4C1.1(a)(3). There are two specific instances revealed at trial that support this

---

[4] As of the time of this memorandum's filing, a Final PSR has yet to be provided. Accordingly, the government's PSR cites will reference the draft PSR filed on December 14, 2023.

[5] Counts Three and Four are Class B misdemeanors, or "petty offenses," to which the Sentencing Guidelines do not apply. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); 18 U.S.C. § 19; U.S.S.G. § 1B1.9.

[6] No acceptance of responsibility adjustment is appropriate here, as Homol went to trial and contested factual guilt on three of the counts for which he was convicted.  *See* U.S.S.G. §3E1.1 Application Note 2; *see also* PSR ¶ 25.

conclusion. First, Homol physically fought with a police officer over his flag and PVC flagpole—an implement he recognized could be used as a weapon and observed being used frequently as weapons against police. Second, Homol threatened the group of officers in the hallway outside the Old Senate Chamber when he stated, "Look, nobody's gotten hurt, yet" and "We're sorry you gotta deal with this, but it's a Trump country, and we're fighting for it like it's 1776."

Additionally, the Court should not apply § 4C1.1 here because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants

who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[7]

### e.   Total Offense Level and Guidelines Range

The U.S. Probation Office calculated Homol's criminal history as a category I. PSR ¶ 48. Accordingly, the U.S. Probation Office calculated Homol's total adjusted offense level, after the 4C1.1 decrease, at 11, and his corresponding Guidelines imprisonment range at 8 to 14 months. PSR ¶ 66. As explained above, that calculation failed to properly apply the cross-reference under U.S.S.G. § 2B2.3(c) to the Count Two conviction for violation of 18 U.S.C. § 1752(a)(1). If the Court nevertheless declines to apply that cross-reference, the government requests that the Court grant an upward variance above the Guidelines range calculated without the cross-reference, up to

---

[7] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

the government's recommendation of 24 months incarceration. Doing so would properly take into account the fact that Homol's trespassing conviction under § 1752(a)(1) was particularly aggravated because it was motivated by his desire to bring the Electoral College certification vote to a halt, and thereby prevent the peaceful transition of Presidential power that has been a hallmark of this country's 247 year history.

In addition, although the statutory maximum sentence for the two § 1752(a) convictions is one year, and the maximum for the two § 5104(e)(2) convictions is six months, this Court may impose the government's recommended sentence of 24 months by stacking the sentences—ordering them to be served consecutively and partially consecutively—in order to achieve the "total punishment." *See* U.S.S.G. § 5G1.2(d) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment."); *United States v. Carr*, 373 F.3d 1350, 1354 (D.C. Cir. 2004) (affirming application of § 5G1.2(d) in case of multiple bank robberies).

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.        Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. As described below, the Section 3553(a) factors weigh in favor of 24 months of incarceration, 1 year of supervised release, 60 hours of community service, a $70 special assessment, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Homol's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

One of the most important factors in Homol's case is the sheer breadth of his eager participation in the riot. His case is not about simply standing on the West Plaza, entering the building momentarily, or getting caught up in the passion of the crowd. Be it on the West Plaza, near the Old Senate Chamber, in the Rotunda, or pressed up against a riot shield at the East Rotunda Doors, Homol was persistent and intentional in staying at the forefront of the mob—unlike defendants with much more limited involvement in the riot. And he supported and took advantage of the riot for at least one-and-a-half hours—time during which he experienced the chaos and violence around him and harnessed it to play his part in disrupting an important election proceeding.

21

Indeed, the video evidence presented at trial shows that Homol was completely unphased by the violence, disorder, and opposition that the Capitol's protectors battled against that day. So long as it enabled him to get into the building and disrupt the certification, Homol continued forward. Notably, Homol's testimony concerning the violence he witnessed revolved exclusively around how he tried to keep *himself* away from "physical contact or physical harm." Sep. 28, 2023 Tr. at 161. Despite the physical violence experienced by *others*, Homol chose to stay close and embark on an extensive journey through the mob from one side of the Capitol to the other.

Another important factor in this case is Homol's after-the-fact disclaiming of responsibility for the extent of his conduct during the riot. To be sure—in the face of overwhelming video, photographic, and testimonial evidence—Homol admitted during his testimony that he unlawfully entered the Capitol grounds and pled guilty to the parading charge. However, for every disorderly and disruptive statement he made and conduct in which he engaged, he claimed he "didn't mean" them. *Id.* at 217. For previous descriptions of the riot that were forthright in describing violence or his enthusiasm, he claimed he was "overexaggerating" or simply telling "a complete and utter lie." *Id.* at 220.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Homol's History and Characteristics

As set forth in the draft PSR, Homol is a high school graduate who briefly studied criminal justice and business at Eastern Florida State College. PSR ¶ 59. He is currently employed full-time as a "computer numerical control" operator at HM Industries. *Id*. Due to his ownership of significant parcels of land, Homol has a net worth of $452,638.75. PSR ¶ 61.

The PSR states that Homol reported that he merely "experimented with marijuana on a few occasions in his late teens." PSR ¶ 58. However, material extracted from Homol's phone—and admitted for other reasons into evidence at trial—suggests that Homol was, at least at the time of the offenses, a continued user of marijuana. *See* GEX 708 ("I got some nug hit me up . . . I got bud and wraps too[.] So we get faded faded[.]").

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power."); *United States v. Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected.") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. The gravity of these offenses demands deterrence. *See United States v. Castro*, 21-cr-299 (RBW), Tr. 2/23/2022 at 41–42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration.

Although Homol pled guilty to one charge and agreed to several evidentiary stipulations for trial, his post-January 6 conduct and statements are troubling. Homol has *not* taken any steps

to denounce his words and actions on January 6, 2021. The Court will recall that Homol described January 6 as "absolutely legendary," GEX 703, "a warning," GEX 707, and "ma[king] a statement," GEX 708. While he has attributed some, though not all, of these accounts as exaggeration or getting caught up in the emotion of it all, the Court must consider, even if true, *why* he would exaggerate or make the choice to give in to emotion. *See* Sep. 28 Tr. at 204:11–12. Accordingly, the Court should view any remorse Homol expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29–30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Homol did not accept the results of the 2020 presidential election, so on January 6 he dressed for violence, armed himself, encouraged violence against police, invaded the Capitol, and boasted about his crimes. With the 2024 presidential election approaching, a political rematch on the horizon, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. This is particularly a concern for an individual who mused on inauguration day, 2021, that "our military failed us [and n]ow it's our duty to overthrow?" GEX 709. Thus, the Court must sentence Homol in a manner sufficient to deter him specifically, and others generally, from repeating their January 6 conduct or engaging in even more extreme acts.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[8] This Court must sentence Homol based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Homol has been found guilty of both Class A and B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do however, apply to all counts of conviction.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Larry Brock*, 21-cr-140 (JDB), Brock was found guilty of violating § 1512(c)(2) and associated misdemeanors. Brock, like Homol, engaged aggressively with social media ahead of the riot. Like Homol, Brock made clear his intent to interfere with Congress and

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

his preparation for a fight. Brock also similarly prepared for violence, wearing body armor and a helmet to the riot. But unlike Homol, Brock, at times, attempted to reign in or calm his fellow rioters, encouraging them to be respectful and refrain from violence or destruction of property. Judge Bates sentenced Brock to 24 months' incarceration.

In *United States v. Landon Mitchell*, 21-cr-508 (BAH), Mitchell was found guilty following a stipulated trial of violating § 1512(c)(2) and associated misdemeanors. Mitchell likewise made numerous posts on social media prior to January 6, such as "Joe Biden IS NOT MY PRESIDENT" and "I'll be in DC Jan. 6th! Whose [sic] with me?" Like Homol, Mitchell anticipated violence as he posed statements like, "if we don't fight now there is no point in ever voting again." Mitchell and Homol both took video footage of rioters on restricted grounds and police officers attempting to defend the building. Mitchell and Homol also entered the Capitol through the Upper West Terrace Door at the same approximate time. Though Mitchell, unlike Homol, entered the Senate Chamber,[9] he also did not stay in the building for nearly as long as Homol, nor did Mitchell need to be pushed by police out of the Rotunda in order to finally exit. Judge Howell sentenced Mitchell to 27 months' incarceration.

In *United States v. Joshua Black*, 21-cr-127 (ABJ), Black was found guilty of three felonies and two misdemeanors following a bench trial but was found not guilty of violating § 1512(c)(2). Like Homol, Black prepared for a fight at the Capitol—he brought a weapon and made his way to the front of the large mob on the West Plaza. Both Homol and Black made physical contact with officers and were undeterred by chaos on the West Plaza and at the East Rotunda Doors. Both travelled extensively through the Capitol building, though Homol remained inside for longer and

---

[9] It appears that Homol was only prevented from nearing the Senate Chamber by the line of officers that halted his progress in the hallway outside the Old Senate Chamber.

had to be pushed out by the police. Despite finding Black not guilty of § 1512(c)(2), Judge Berman-Jackson sentenced him to 22 months' incarceration.

In *United States v. Kenneth Thomas*, 21-cr-552 (DLF), a jury found Thomas guilty of five felonies—including four violations of 18 U.S.C. § 111(a)(1)—and two misdemeanors. The jury acquitted Thomas of counts charging violations of 18 U.S.C. § 1512(c)(2) and 40 U.S.C. § 5104(e)(2)(F) and hung on two other counts charging violations of 18 U.S.C. § 111(a)(1) and 40 U.S.C. § 5104(e)(2)(D). Like Homol, Thomas was well-aware of the certification proceeding inside the Capitol and made that knowledge clear over social media. Indeed, both Homol and Thomas recorded themselves proudly declaring that they were "storming" the Capitol. Both defendants also consistently appeared at or near the front of the mob. While Thomas also faced sentencing on multiple assaults on police, Judge Friedrich applied the U.S.S.G. § 2B2.3(c) cross-reference that the government seeks for Homol as part of the Court's guidelines calculation. Judge Friedrich ultimately sentenced Thomas to 58 months' incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.   Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Homol was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[10]

Because Homol in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a

---

[10] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."). *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Homol to pay $500 in restitution for his convictions on Counts 2 through 5. This amount fairly reflects Homol's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where Homol was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Homol to 24 months of incarceration, 1 year of supervised release, 60 hours of community service, a $70 special assessment, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Homol's liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Elizabeth N. Eriksen*
ELIZABETH N. ERIKSEN
VA Bar no. 72399
Trial Attorney, Detailee
U.S. Dept. of Justice, Criminal Division
Detailed to the USAO-DC
601 D Street NW
Washington, DC 20530
Elizabeth.Eriksen@usdoj.gov
(202) 616-4385

*/s/ Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7759